**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

| | |
|---|---|
| **7-ELEVEN #22360**, et al., | |
| **Plaintiffs**, | |
| v. | **CIVIL ACTION NO.   21-cv-57 (ELH)** |
| **UNITED STATES OF AMERICA**, | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF THE MOTION FOR PRELIMINARY INJUNCTION AND REINSTATEMENT OF SNAP PARTICIPATION** |
| **Defendant.** | |

The Plaintiffs, 7-ELEVEN #22360, a sole proprietorship, and MD MAHBUB UR RASHID, an Individual, by and through their undersigned counsel, pursuant to 7 U.S.C. §2023(a)(17) and hereby file this Memorandum in Support for the Motion for Preliminary Injunction and Reinstatement of SNAP Participation, and in support thereof, state the following.

## INTRODUCTION TO SNAP STATUTORY AND REGULATORY FRAMEWORK; CASE HISTORY

This matter is before the Court for a Judicial Review of the Defendants' Final Agency Decision finding that the Plaintiffs' trafficked in SNAP benefits.  This case, though arising from an administrative action, is not a part of the Administrative Procedures Act, *per se*, though it shares common terminology.  Instead, the administrative portions of this case proceeded under 7 U.S.C. §2021 (2020) and 7 C.F.R. §278.6 and 7 C.F.R. §§279.1-6 (2020).  This action is governed by 7 U.S.C. §2023 (2020).

At the administrative level, this case was initiated by the Defendant through the issuance of a Charge Letter[1] dated August 6, 2020 in which the Plaintiffs were accused of trafficking in SNAP benefits.  Through a process devoid of an evidentiary hearing, administrative law judges,

---

[1] Charge Letters are outlined in 7 C.F.R. §278.6(b) (2020).

and meaningful discovery, the Defendant found that trafficking had occurred.  Though whether or not trafficking occurred is a subject of *trial de novo* review under 7 U.S.C. §2023(13)-(15) (and discussed in Count I of the Complaint), the immediate subject of this motion is the Agency's choice of sanction.  Namely, the Agency opted to issue a permanent disqualification under 7 C.F.R. §278.6(e)(1)(i) rather than issue a Trafficking Civil Money Penalty (TCMP) under 7 C.F.R. §278.6(i).  The difference between the two sanctions is tremendous in that the civil money penalty permits the store to retain its EBT license and continue to process transactions.

After the Defendant issued a determination letter to the Plaintiffs notifying them that the Agency intended to issue a permanent disqualification, the Plaintiffs sought Administrative Review of the finding of trafficking and the choice of sanction on October 29, 2020.  In their brief to the Administrative Review Officer (a lay Agency official with no legal training), the Plaintiffs raised the issue that the Agency's choice of sanction was incorrect.

The Administrative Review process does not afford the Plaintiffs any additional information or an evidentiary hearing.  Instead, the regulation relies upon the Plaintiff to again produce additional information in response to the transaction categories. 7 C.F.R. §279.5.  The Administrative Review Officer then takes the information submitted by the retailer, the undisclosed information submitted by the charging section, and such other information as he/she deems appropriate, and issues a written determination, titled "Final Agency Decision."  *Id*.

The Final Agency Decision in this matter was dated December 23, 2020, and in pertinent part, it upheld the initial disqualification.  As noted on page 8 of the Final Agency Decision, the Plaintiffs had the right to file a Judicial Review, pursuant to 7 U.S.C. §2023(a)(13)-(15).

### History of the Effective Date and Stay-of-Action Provisions

The Supplemental Nutrition Assistance Program was born out of the 1964 Food Stamp

Act, and at the time, was referred to as the Food Stamp Program. Food Stamp Act of 1964, Pub.

L. No. 663, 78 Stat. 707 (1964). The original provisions of what came to be 7 U.S.C. §2023(a),

were initially set out as a complete, uninterrupted paragraph setting out procedural processes and

substantive rights for retailers.  In pertinent part, this subsection set out the effective date of agency

disqualifications of participating retailers:

> [If a disqualified retailer requests a review of a disqualification],
> such information as may be submitted by the store or concern, as
> well as such other information as may be available, shall be
> reviewed by the person or persons designated, who shall, subject to
> the right of judicial review hereinafter provided, make a
> determination which shall be final and **_which shall take effect_**
> **_fifteen days <u>after</u> the date of the delivery_** or service of such final
> notice of determination. *Id.* at §13 (emphasis added).

As such, a disqualification of any type, had an effective date of fifteen days after the Final

Agency Decision.  The statute continued, setting out a retailers' right to seek Judicial Review of

the final agency decision, which was to be filed within thirty days of the delivery of the decision.

However, a retailer would have the right to seek injunctive relief against the Department's

disqualification during the judicial review:

> During the pendency of such judicial review, or any appeal
> therefrom, the administrative action under review shall be and
> remain in full force and effect, unless an application to the court on
> not less than ten days' notice, and after hearing thereon and a
> showing of irreparable injury, the court temporary stays such
> administrative action pending disposition of such trial or appeal. *Id.*

The Congressional notes pertaining to the disqualification of retailers for this language is

set out in the Congressional Record, where the Senate provides the following explanations:

> Section 11. Disqualification of retail food stores and wholesale food
> concerns. . . .

> This section, however, does provide for the disqualification of any
> wholesale or retail food concern from participation in the food stamp
> program when there is evidence that the store or concern is not
> adhering to the requirements established in this act. Such action may

be taken by the Secretary only pursuant to the provisions for administrative action set out in section 13 and there is no authority for the Secretary to suspend or revoke participation in the program without due notice and an opportunity for hearing.

Section 13.  Administrative and Judicial Review

The rights of retailers and wholesalers are carefully guarded under the provisions of this act.

This section provides for administrative and judicial review of the decision of the Secretary with respect to the denial of application of a retail or wholesale food concern to participate in the program, the disqualification of such a participating concern, or the denial of all or any part of a claim of such concern under the provisions of section 12.

This section provides, in brief, that notice of any such proposed action the part of the Secretary must be delivered to the concern involved by certified mail or personal service; that the concern shall have a period of 10 days in which to submit information in support of its position; that if the decision following such administrative review is against the food concern it shall have a period of 15 days before any order takes effect, and a total period of 30 days, during which it may file an action in the U.S. district court. . . seeking to have the determination of the Secretary set aside. S. REP NO. 88-1124 (1964), *as reprinted in* 1964 U.S.C.C.A.N. 3275, 3291.

The Stay of Administrative Action provision remained intact through a number of other changes to the Food Stamp Act until 1985, when Congress amended the standards for entry of the stay by striking "showing of irreparable injury" and replacing it with "consideration by the court of the applicant's likelihood of prevailing on the merits and of irreparable injury." Food Security Act of 1985, Pub. L. No. 99-198, §1536, 99 Stat. 1354, 1585 (1985).  Effectively, this revision required the retailer to demonstrate the strength of its case – thereby mitigating damages to wrongly accused and disqualified retailers.

The section was next modified in 1996. This was when §2023 got a layout overhaul and subsection (a) split into 17 paragraphs (one for each sentence as it existed previously). Congress, having modified none of the pre-existing provisions, added an 18th paragraph, which read as

follows:

> (18) SUSPENSION OF STORES PENDING REVIEW. – Notwithstanding any other provision of this subsection, any permanent disqualification of a retail food store or wholesale food concern under paragraph (3) or (4) of section 2021(b) shall be effective from the date of receipt of the notice of disqualification. If the disqualification is reversed through administrative or judicial review, the Secretary shall not be liable for the value of any sales lost during the disqualification period. 7 U.S.C. §2023(a)(18) (2020).

This provision was part of a larger effort by Congress to enact more stringent punishments for those that trafficked in SNAP benefits. These changes encompassed criminal forfeitures on the part of retailers who were found to have trafficked, and increased penalties for participants including longer suspension times and permanent disqualifications.

However, the new subsection (a)(18) made no mention of the provisions of the stay, nor did it suggest by inference that trafficking allegations, even where the retailer appeared likely to prevail – and would suffer irreparable harm without court intervention – would be excluded from the stay. What it did modify is the previous version of the statute which allowed fifteen days (or in the current iteration thirty days) after the receipt of notice of disqualification before the disqualification took place. Now, instead of that fifteen-day period the disqualification would begin immediately on the receipt of notice for permanent disqualifications.

The Defendant, displeased with Congress' lack of restriction on the stay, pushed harder and attempted to graft regulations in an attempt to limit Congress' grant of stay authority to the district courts. In 7 C.F.R. §279.7(d), the Defendant copied the provisions of 7 U.S.C. §2023(a)(18), except in that it added a line which materially changes the statute:

> Stay of action. During the pendency of any judicial review, or any appeal therefrom, the administrative action under review shall remain in force unless the firm makes a timely application to the court and after hearing thereon, the court stays the administrative action after a showing that irreparable injury will occur absent a stay and that the firm is likely to prevail on the merits of the case.

> ***However, permanent disqualification actions taken in
> accordance with §278.6(e)(1) of this chapter shall not be subject
> to such a stay of administrative action.*** If the disqualification
> action is reversed through administrative or judicial review, the
> Secretary shall not be liable for the value of any sales lost during
> the disqualification period. C.F.R. §279.7(d) (2020) (emphasis
> added).

The Defendant's addition of the above emphasized language appears to be a result of a

fundamental misunderstanding as to what it was that Congress had intended in the 1996

amendments. In the commentary to the final rule, FNS discusses the Personal Responsibility and

Work Opportunity Reconciliation Act of 1996, Pub L 104-193 (PRWORA), which was the set of

laws through which Congress overhauled the Food Stamp Program's regulations. *See* Food Stamp

Program: Retailer Integrity, Fraud Reduction and Penalties, 64 Fed. Reg. 23165.

In pertinent part, FNS notes that the Congressional changes appear to modify the then-

current practice of permitting EBT machines to stay on pending completion of the Administrative

Review, much how the other cases are handled. The commentary reads as below:

> Section 845 of the PRWORA amends section 14 of the [Food Stamp Act]
> to require that a permanent disqualification of a firm from the [Food Stamp
> Program] be effective from the date of the firm's receipt of the notice of
> disqualification. . . This nondiscretionary provision was effective upon the
> date of enactment of the law, and affects firms that are subject to permanent
> disqualification for trafficking in the program, as well as those firms subject
> to permanent disqualification for having been sanctioned twice before for
> violations of the program. These changes are found at §278.6(b) of the final
> rule. ***Editorial revisions have also been made to §§278.8(a), 279(a) and
> 279.10(d).*** *Id*. at 23169 (emphasis added).

It appears that FNS's changes to this section were intended to reflect what the law stated,

rather than an interpretation of Congress' restriction on authority. A full reading of this section of

the regulatory notes indicates that FNS was attempting to effectuate provisions that would change

the internal procedures to impacting permanent disqualification cases (such as trafficking or

repeat-offender cases) so that an initial finding of trafficking would result in a termination of the

machine much sooner than term disqualification cases (where the cases followed Congress' original intent of permitting the machine to remain on until a hearing could be achieved).

This additional language, however, would yield illogical results, which is why Congress likely excluded it: where a disqualified retailer is faced with imminent, irreparable harm (such as a complete loss of the business), but could demonstrate a likelihood of prevailing on its claim to set aside the Final Agency Decision (and prove its innocence), the retailer would be denied such relief thereby forcing the *irreparable harm* upon the retailer, and mooting the entire purpose of the Judicial Appeal by destroying the business which seeks reversal.  This would be the highest order of a miscarriage of justice, and plainly outside Congress' language and intent.

### Availability of the Stay and *Tony's Pantry Mart*

This matter was addressed at length in *Tony's Pantry Mart, Inc. v. U.S. Department of Agriculture Food and Nutrition Service* and *Dinner Bell Markets, Inc. v. United States*, wherein the district court found the additional language in the regulation was not controlling of the court's authority, nor was there any basis to defer to the Department's analysis under the framework of *Chevron vs. National Resources Defense Counsel, Inc*., 467 U.S. 837 (1984).

The Court in *Dinner Bell Market* explained in detail why the statute does not restrict stays.

> Section 2023(a)(18), does use the preamble, "Notwithstanding any other provision of this subsection . . .," however, even in light of the legislative history, most reasonably it is a reference to § 2023(a)(5). As the *Lazaro* court explained, paragraph 5 sets the effective date for the penalty associated with a final notice of determination. On its face, it unambiguously applies to any final notice of determination, until you read § 2023(a)(18), which specifically makes "any permanent disqualification" of a retailer for trafficking "effective from the date of receipt of the notice of disqualification. . . ." In other words, § 2023(a)(18) is an exception to § 2023(a)(5). This interpretation is the one most harmonious with the legislative history discussed by the USDA, which essentially tracks the language of § 2023(a)(18). Further, there is no mention of the right to a stay in § 2923(a)(18); rather the only thing it

mentions is the effective date of a notice of disqualification. The most reasonable interpretation is that the "notwithstanding" phrase refers to other parts of the subsection that relate to an effective date and not to any other paragraph. *Dinner Bell Markets, Inc. v. United States*, 116 F. Supp. 3d 905, 913 (S.D. Ind. 2015) (citations omitted).

The court there concluded that this was an unambiguous statute and that § 2023(a)(18) does not restrict stays for permanent disqualifications.

*Tony's Pantry Mart* surveyed the number of district courts that had evaluated 7 U.S.C. §2023(a)(17) and 7 C.F.R. §279.7:

As Defendant acknowledges, however, the federal district courts that have considered this question have construed the statutory scheme under *Chevron* in various ways. See, e.g., *Dinner Bell Mkts.*, 116 F.Supp.3d at 913 (S.D. Ind. 2015) (statute unambiguous); *Skyson USA, LLC v. United States*, 651 F.Supp.2d 1202, 1208 (D. Haw. 2009) (statute ambiguous and agency's interpretation reasonable); *Lazaro v. United States Dept. of Agric.*, 186 F.Supp.2d 1203, 1211 (M.D. Fla.2001) (statute unambiguous, so reasonableness of agency's interpretation not at issue); *Ilaian v. United States Dept. of Agric.*, 87 F. Supp. 2d 1047, 1047 (S.D. Cal. 2000) ("plain language of 7 U.S.C. § 2023(a)(18) reflects that a stay is not available in cases of permanent disqualification for trafficking"); see also *Ameira Corp. v. Veneman*, 169 F. Supp. 2d 432, 437 (M.D.N.C. 2001) (without discussing Chevron, concluded courts cannot stay administrative action during judicial review in trafficking cases); *Ahmed v. United States*, 47 F. Supp. 2d 389, 393 (W.D.N.Y. 1999) (without discussing Chevron, granted stay under § 2023(a)(17)). In addition, one district court questioned whether the Chevron framework was an appropriate consideration in the first instance because "the statute at issue does not appear to be a delegation of power to the USDA but instead is directed to the statutory grant of authority to the court. *Alkabsh v. United States*, 733 F. Supp. 2d 929, 934 (W.D. Tenn. 2010). *Tony's Pantry Mart Inc. v. United States of Am. Dep't of Agric. Food & Nutrition Serv.*, 175 F. Supp. 3d 987, 989 (N.D. Ill. 2016).

Ultimately, *Tony's Pantry Mart* concluded that "this statutory scheme is not ambiguous, and thus the Court need not determine whether the USDA's interpretation in 7 CFR §279.7(d) is reasonable." *Id.* at 994. Accordingly, the district court there held, "the statute does not restrict the

Court's ability to stay the proceedings pending the final review of the FNS's determination." *Id*.

Notably, the District of Maryland does not appear to have any precedent on the matter, nor apparently have any of the Circuit Courts.  The only more-recent decision than *Tony's Pantry Mart* was in *Kajjy vs. United States*, 2018 WL 747676 (S.D. Cal. 2018) which held that the stay of action was not available because (a)(18) stated "notwithstanding any other provision of this subsection," concluding that the language meant that Section (a)(17) was inapplicable.  *Id*.  at *4.

However, the Southern District's interpretation of the language of the statute utterly misses the plain intent on the face of Congress' 1996 intentions — and even FNS's 1999 rule commentary — that the intention of (a)(18) was to make it so that subsection (a)(5) (". . . [determinations] shall take effect thirty days after the date of the delivery or service of such final notice of determination") was not applicable to permanent disqualification cases.

There have been other cases, not listed by *Tony's Pantry Mart* in the excerpt above, that have come down in odd positions of the matter as well: *Mr. Smoky's BBQ vs. United States*, 2014 WL 24152 (D. Ariz.) the district court found that the permanent disqualification procedures utilized by the Defendant deprived the retailer of due process rights, and entered an injunction against the Defendant from enforcing a permanent disqualification; *Barrie vs. United States*, 2016 WL 2659549 (E.D.N.Y. 2016) noted the availability of stays in permanent disqualification cases, though determines that the case is not properly before the Court and denies a preliminary injunction without prejudice; *R & T Mini Mart, Inc. vs. U.S. Department of Agriculture, Food and Nutrition Service*, 2008 WL 108592 (E.D. Mich.  2008) touches on the subject of the stay in permanent disqualification cases, but ultimately avoids the issue by noting that the retailer had not yet cleared the administrative review phase and as such, it had no authority to enter a stay (or address the case at all). However, the Eastern District of Michigan later decided the issue, agreeing with *Dinner*

*Bell Markets* and *Tony's Pantry Mart*:

> The statute here is not ambiguous. The plain meaning of the statute directs the court to consider likelihood of success on the merits and irreparable injury. To consider is "[t]o view or contemplate attentively, to survey, examine, inspect, scrutinize." Oxford English Dictionary (2d ed.1989). Notably, "to find" or the like is not among the definitions of consider. The administrative regulation is thus at odds with the text of Congress's statute. It only permits a court to issue a stay after a showing of likelihood of success and irreparable harm, rather than allowing a court to weigh the factors. *Jefferson Vill. Enterprises, Inc. v. United States,* No. 10-14638, 2011 WL 740896, at *3 (E.D. Mich. Feb. 24, 2011) (followed by *Mojo Express v. United States*, No. 19-CV-12970, 2019 WL 5294355 (E.D. Mich. Oct. 18, 2019)).

## <u>Analysis of the Plaintiffs' Right to Request a Stay</u>

As discussed at length above, subsection (a)(18) addresses the immediate implementation of a disqualification upon the initial determination.  That is how FNS interpreted it, and that is the plain language in the statute.

At the time this subsection was crafted, permanent disqualifications for trafficking were abated until weeks after a Final Agency Decision had been made – permitting violators to continue to violate while they ran out the clock over the course of months or years.  This change in procedure is discussed significantly in the Defendant's notes to final rule updates. *See* Food Stamp Program: Retailer Integrity, Fraud Reduction and Penalties, 64 Fed. Reg. 23165 at 23169.

Its physical location in the statute is happenstance, not the result of a careful drafting and structuring of the statute (the whole statute is hap-hazardly put together, as has been a regular comment by the courts – "it is an ineptly-worded statute" *Redmond vs. U.S.*, 507 F.2d 1007, 1012 (5th Cir. 1975)).  If it were a car, it would be as though Congress just jumbled the thing together, put some numbers on it, added a spoiler and sent the thing out the door.  But to attribute some grand design to the location of subsection (a)(18), as though Congress had intended such location

to be impactful, is a step too far.

## THE PLAINTIFFS MEET THE CRITERIA SET OUT IN §2023(A)(17)

According to the statute, a disqualified retailer may obtain a stay (injunction) of the administrative action upon the following circumstances: (1) the movant's likelihood of prevailing on the merits of the case; and (2) the demonstration of irreparable injury that may result without the court's intervention.

## PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS OF THE CASE

In the instant matter, the Plaintiffs are charged with the misuse of SNAP benefits in which it believes trafficking has occurred.  Attached hereto as **Exhibit A,** the Charge Letter dated August 6, 2020 sets out two (2) allegations of violations on the part of the Plaintiffs.  Though the Plaintiffs challenge whether or not the alleged violations occurred as described in the broader scope of this case, the substance of this motion is confined to the choice of sanction as the difference between the issuance of a civil money penalty and a permanent disqualification are severe.  With that in mind, this motion is argued as though the finding of trafficking would remain.

When a finding of trafficking is made by the Department, the Defendant has the option of issuing a permanent disqualification under 7 C.F.R. §278.1(e)(1)(i), or issuing a Trafficking Civil Money Penalty pursuant to §278.6(i).  However, the issuance of a TCMP has a number of criteria that the retailer must satisfy in order for the Department to issue it.  The retailer's compliance with the criteria is to be graded upon the "substantial evidence" standard.  See *Affum vs. United States*, 566 F.3d 1150, 1162-1163 (C.A.D.C. 2009).  The substantial evidence standard means "more than a scintilla, but less than a preponderance of the evidence."  *Id* at 1163.  Furthermore, given the flexibility inherent to the regulation's drafting, a retailer needs not present any particular form of evidence to qualify.  *Id*.

As mentioned above, the criteria for a TCMP in 7 C.F.R. §278.6(i) are as follow:

Criterion 1. The firm shall have developed an effective compliance policy as specified in §278.6(i)(1); and

Criterion 2.  The firm shall establish that both its compliance policy and program were in operation at the location where the violation(s) occurred *prior* to the occurrence of violations cited in the charge letter sent to the firm; and

Criterion 3. The firm had developed and instituted an effective personnel training program as specified in §278.6(i)(2); and

Criterion 4.  Firm ownership was not aware of, did not approve, did not benefit from, or was not in any way involved in the conduct or approval of trafficking violations; or it is only the first occasion in which a member of firm management was aware of, approved, benefited from, or was involved in the conduct of any trafficking violations by the firm.  Upon the second occasion of trafficking involvement by any member of the firm management uncovered during a subsequent investigation, a firm shall not be eligible for a civil money penalty in lieu of permanent disqualification. Notwithstanding the above provision, if trafficking violations consisted of the sale of firearms, ammunition, explosives or controlled substances, as defined in 21 U.S.C. §802, and such trafficking was conducted by the ownership or management of the firm, the firm shall not be eligible for a civil money penalty in lieu of permanent disqualification. For purposes of this section, a person is considered to be part of a firm management if that individual as substantial supervisory responsibilities with regard to directing the activities and work assignments of store employees.  Such supervisory responsibilities shall include the authority to hire employees for the store or terminate the employment of individuals working for the store. 7 C.F.R. §278.6(i).

The Plaintiffs' evidence shows that it meets all four criteria, and accordingly, should have been issued a TCMP in lieu of a permanent disqualification.  The evidence to support the Plaintiffs' position (and argument in support thereof) are set out below.

**_Criterion 1_**:  *The firm has developed an effective compliance policy based upon the generally available training materials set forth on the Department's SNAP retailer website.*

Attached as Exhibit B are the SNAP training materials that the Plaintiffs used and attached as Composite Exhibit C are the signed documents showing that the employees completed the training. The SNAP training is the official guide published by the USDA. They also required the employees to go through SNAP training required by 7-Eleven. Also attached as Composite Exhibit D are pictures posted around the store stating that the penalty for engaging in EBT trafficking is imprisonment or a fine. These posters were placed conspicuously on the front door of the store, behind the counter, and in front of the counter. It would be impossible for the employees of the store to not notice these written policy statements, and that there would be significant consequences for engaging in trafficking.

The Plaintiffs' official policy, as set out in the 7-Eleven training and the posters around the business, is that SNAP trafficking and the sale of ineligible items is prohibited.  In addition to the policies and the training offered by the store, the Plaintiffs put into operation a number of other preventative measures such as computerized registers.  See Affidavit of MD Rashid, ¶4 attached hereto as **Exhibit E**.  These registers will not permit trafficking to occur, and otherwise prevent the sale of ineligible items.

As to the effectiveness of the Plaintiffs' Compliance Program, the Charge Letter (attached hereto as **Exhibit A**) sets out specific examples where the store's personnel refused to violate the regulations, in conformity with their training.  Exhibit A to the Charge Letter states:

> I entered the subject store, placed all items on the counter and presented the EBT card to the clerk for purchase.  The clerk removed the non-food items and stated that they could not be purchased using SNAP benefits.  I asked the clerk to utilize the EBT card for the non-food items and the clerk refused.  The clerk then completed the transaction for the food items only.

Likewise, Exhibit F to the Charge Letter also demonstrates compliance with the regulations by the same clerk:

> I entered the subject store, placed all items on the counter, and presented the EBT card to the clerk for purchase. The clerk removed the non-food items and stated that they could not be purchased using SNAP benefits. I asked the clerk to utilize the EBT card for the non-food items and the clerk refused. The clerk then completed the transaction for the food items only.

Conversely, it appears that the investigation alleges only a single clerk to have committed violations. Exhibits B-E to the Charge Letter are all the same Clerk. As such, there is evidence that the training and compliance policies were effective, although allegedly not able to prevent the Exhibit B clerk from violating the regulations. Therefore, the Plaintiffs satisfy Criterion 1.

**_Criterion 2_**: *The policy was in existence prior to the letter received by my clients, as is evidenced by the signed records that are in your possession and have been in effect since the store opened.*

There's little doubt that the Plaintiffs satisfy this Criterion, as set out in Exhibit C, the documentation of employees that have completed the training for SNAP. There are fourteen different signed records showing that the employees completed the training, most of which occurred before the alleged trafficking. Further, it is required by 7-Eleven that all franchisees give SNAP/EBT training to new employees shortly after they're hired. Therefore, between the Training Acknowledgment Forms, and the Certificates issued by 7-Eleven's training service 7 Excel University, there's substantial evidence to support the Plaintiff's contention that they satisfy Criterion 2.

**_Criterion 3_**: *The training program utilized by the store is an effective personnel training program, which was delivered, reviewed, and executed immediately upon the completion of training by the transaction personnel. The training materials, which are in writing, show that the exchange of benefits for ineligible items is strictly prohibited.*

As mentioned above, the training program was clearly effective as the other clerk tested by the investigator refused the sale of ineligible items both times the investigator attempted to violate the regulations.  The Training Acknowledgment Forms are proof that the training was delivered, reviewed and executed immediately upon the completion of training.  Furthermore, the training materials (which are shown in the pictures attached hereto as Exhibit D**)** show that the exchange of benefits for ineligible items is strictly prohibited.  Therefore, the Plaintiffs satisfy Criterion 3.

**_Criterion 4_**:  *Neither management nor ownership was aware of, benefitted from, nor was in any way involved in the conduct or approval of trafficking violations.  Furthermore, there are no allegations of such trafficking involving firearms, ammunition, explosives or the like.*

There is no evidence whatsoever that the management was in any way involved in, aware of, or approved of this.  The Defendant's investigation never mentions the store's ownership or management as having anything to do with the transactions, nor do the transactions involve weapons, ammunition or explosives.   Furthermore, the Plaintiffs have denied repeatedly that management or ownership was involved in the alleged transactions.  A.R. 147, A.R. 269.  The Defendant appears to have conceded this as well, as the Program Specialist states in the Administrative Record, "There is no evidence to dispute Mr. Margolis's assertion that Mr. Rashid was not involved in any way in the trafficking violation."  *Id* at A.R. 269.  Therefore, the Plaintiffs satisfy Criterion 4 as well.

Having met all four criteria set out by the regulation, there can be no doubt that the Plaintiffs are likely to succeed on the merits of their case that a TCMP should have been issued instead of a permanent disqualification (had trafficking occurred), and that their EBT privileges should not have been suspended.

### PLAINTIFFS WILL SUFFER IRREPARABLE INJURY

Plaintiffs are in danger of going out of business and suffering irreparable harm prior to the conclusion of this Judicial Review Process. The Plaintiffs' business is gravely reliant upon SNAP transactions, as 20% of the store's total revenue is derived from SNAP transactions and the customers who cannot use their benefits there will stop shopping at the store. Accordingly, the loss of 20% of the store's revenue during this litigation would be an irreparable harm to the store as it would cause the store to go out of business. In addition to the 20% gross revenue loss, Plaintiff Md Mahbub Ur Rashid is being fined by 7-Eleven $697 for every day that he does not have an active EBT License, in addition to a penalty for list EBT sales. See Exhibit E, Rashid ¶10-15. The Plaintiffs are in considerable danger of losing the franchise and suffering major financial loss if he is permanently disqualified from the SNAP program. The attachments to Mr. Rashid's affidavit show that the store nets roughly $6,250 per month at the moment – an amount far less than what thirty days of fines ($20,910) and revenue penalties (more than $10,000 per month) are accruing as this case continues. As attested to by Mr. Rashid, these damages are precisely the type of harm that the statute was intended to prevent, and given the Plaintiffs' likelihood of success on the merits, it's difficult to understand why an injunction would not be entered.

### CONCLUSION

For the reasons stated above, the Court should find that the Plaintiffs have a likelihood of success on the merits of their case, and that absent a stay of the Defendant's disqualification of the store from participating in SNAP, irreparable injury is likely to befall the store and the participants. Accordingly, it is only appropriate for an injunction to be entered staying the Defendant's proposed disqualification of the Plaintiffs until such time as the parties can reach trial on this matter, or until such time as the Court may otherwise address the matter on the merits.

Dated: May 13, 2021                    Respectfully submitted,


                                       **METROPOLITAN LAW GROUP, PLLC**

                                       */s/ Andrew Z. Tapp*
                                       ANDREW Z. TAPP, ESQ.
                                       Florida Bar No.: 68002
                                       *Pro Hac Vice*
                                       1971 W. Lumsden Road, #326
                                       Brandon, Florida 33511-8820
                                       Telephone:  (813) 228-0658
                                       Facsimile: (813) 330-3129
                                       Email:  Andrew@Metropolitan.Legal


                                       and


                                       **DARREN MARGOLIS, P.A.**


                                       */s/ Darren Margolis*
                                       Darren Margolis, Esq.
                                       Maryland Bar No. 23806
                                       104 Church Lane # 203
                                       Pikesville, MD 21208
                                       Telephone:  (410) 777-5539
                                       Facsimile:   (410) 777-5243
                                       Email:   dmargolis@lawdmpa.com


                                       **COUNSEL FOR PLAINTIFFS**


## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on May 13, 2021, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to the

following:

        Molissa H. Farber, Esq.
        Molissa.Farber@usdoj.gov

                                       */s/ Andrew Z. Tapp*
                                       ANDREW Z. TAPP, ESQ.
                                       Florida Bar No.: 68002
                                       *Pro Hac Vice*