IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

7-ELEVEN #22360, *et al.*,
  *Plaintiffs*

   v.

UNITED STATES OF AMERICA
  *Defendant.*

Civil Action No. ELH-21-0057

## MEMORANDUM OPINION

  This case arises under the Supplemental Nutrition Assistance Program ("SNAP" or the "Program") and concerns the penalty of permanent disqualification imposed on a SNAP retailer because of two "trafficking" violations committed by a rogue employee. The retailer is a 7-Eleven convenience store in Baltimore. In effect, as a sanction for the violation, the government seeks to put the store out of business.

  SNAP was established pursuant to the Food Stamp Act of 1964, as amended, 7 U.S.C. § 2011 *et seq.* (the "Act"). It is administered by the Food and Nutrition Service ("FNS"), which is part of the U.S. Department of Agriculture ("USDA" or "Department"). *See* 7 C.F.R. § 271.3.[1] I shall sometimes refer to FNS and the Department collectively as the "Agency." FNS determined that the store engaged in the trafficking of SNAP benefits when, on two occasions, an employee (who has since been terminated) exchanged benefits for cash. Although the retailer sought a civil money penalty ("CMP"), FNS determined to permanently disqualify the store from participating

---

[1] The program was originally referred to as the "Food Stamp Program." *See* The Food Stamp Act of 1964, H.R. 10222, 88th Cong. § 3(k) (1964). In 2008, Congress replaced the "Food Stamp Program" with the "Supplemental Nutrition Assistance Program." *See* Food, Conservation, and Energy Act of 2008, H.R. 6124, 110th Cong. § 4001 (2008).

in SNAP. *See* 7 U.S.C. § 2021(a); 7 C.F.R. § 278.6. A Final Agency Decision, issued on December 23, 2020, affirmed that decision. *See* ECF 6 ("Final Agency Decision" or "FAD").

Thereafter, 7-Eleven #22360 (the "Store"), and the franchise owner, MD Mahbub Ur Rashid, plaintiffs, filed suit against the United States (ECF 1), seeking judicial review of the FAD. The Complaint contains two counts. In Count I, pursuant to 7 U.S.C. § 2023 and 7 C.F.R. § 279.7, plaintiffs seek judicial review of the finding by FNS that the Store trafficked in SNAP benefits. ECF 1, ¶¶ 27-32. And, in Count II, plaintiffs seek judicial review of the decision by FNS to impose the penalty of permanent disqualification, in lieu of a CMP. *Id.* ¶¶ 33-37.

On May 13, 2021, months after the suit was filed, plaintiffs moved for a preliminary injunction (ECF 10), seeking to enjoin the government from enforcing the permanent disqualification penalty during the pendency of the litigation. The motion for preliminary injunction is supported by a memorandum (ECF 10-1) (collectively, the "Motion") and 17 exhibits. ECF 10-2 to ECF 10-18. The government opposes the Motion (ECF 12) and has provided two exhibits (ECF 12-1; ECF 12-2). Plaintiffs have replied (ECF 15) and submitted two additional exhibits. ECF 15-1; ECF 15-2.[2]

On June 17, 2021, the Court held an evidentiary Motion hearing. ECF 16. Plaintiff called three witnesses and introduced several exhibits. Argument was also presented.[3] For the reasons that follow, I shall grant the Motion.

---

[2] The parties have not submitted the entire Administrative Record. However, most of the exhibits submitted to the Court were also submitted to the FNS and became part of the Administrative Record.

[3] I do not have a transcript of the hearing. Therefore, in recounting any testimony, I have relied on my notes.

# I.   SNAP

SNAP is intended "to promote the general welfare, to safeguard the health and well-being of the Nation's population by raising the levels of nutrition among low-income households." 7 U.S.C. § 2011. To achieve that mission, SNAP provides qualifying individuals and families with supplemental funds to purchase eligible items from approved retailers. *Id.* §§ 2013, 2018; 7 C.F.R. § 278.1.

Beneficiaries of SNAP are provided with benefits by way of an Electronic Benefits Transfer ("EBT") card. *See* 7 U.S.C. § 2016(j)(1)(A). The EBT operates like a debit card.  But, it may only be used to buy designated food items from authorized SNAP retailers. *Id.* § 2013(a); *see also* 7 C.F.R. § 271.2 (defining "eligible foods" as, in pertinent part, "[a]ny food or food product intended for human consumption except alcoholic beverages, tobacco, and hot foods and hot food products prepared for immediate consumption"); 7 U.S.C. § 2018 ("Approval of Retail Food Stores and Wholesale Food Concerns"); 7 C.F.R. § 278.1 (same).

Of relevance here, "trafficking" in SNAP benefits is prohibited. 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i). "Trafficking" is defined in pertinent part as "buying, selling, stealing or otherwise effecting an exchange of SNAP benefits issued and accessed via Electronic Benefit Transfer (EBT) cards ... for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others, or acting alone." 7 C.F.R. § 271.2.

FNS periodically reviews authorized retailers and may disqualify an approved retail store that violates the Act or its implementing regulations.  In particular, 7 U.S.C. § 2021(a) provides (bold in original):

**(a) Disqualification**

**(1) In general**

An approved retail food store or wholesale food concern that violates a provision of this chapter or a regulation under this chapter may be –

    (A) disqualified for a specified period of time from further participation in the supplemental nutrition assistance program;

    (B) assessed a civil penalty of up to $100,000 for each violation; or

    (C) both.

**(2) Regulations**

Regulations promulgated under this chapter shall provide criteria for the finding of a violation of, the suspension or disqualification of and the assessment of a civil penalty against a retail food store or wholesale food concern on the basis of evidence that may include facts established through on-site investigations, inconsistent redemption data, or evidence obtained through a transaction report under an electronic benefit transfer system.

Originally, the Food Stamp Act of 1964 left the issue of disqualification for trafficking violations to the discretion of the Secretary of USDA (the "Secretary"). *See Corder v. United States*, 107 F.3d 595 (8th Cir. 1997) (discussing statutory history of Food Stamp Program); *Ghattas v. United States*, 40 F.3d 281, 283-84 (8th Cir. 1994) (same); *Ahmed v. United States*, 47 F. Supp. 2d 389, 393 (W.D.N.Y. 1999) (same). Then, from 1982 to 1988, the Act eliminated any discretion and mandated permanent disqualification for trafficking violations. *See Castillo v. United States*, 989 F. Supp. 413, 417 (D. Conn. 1997). But, in 1988, Congress amended the statute, conferring discretion on the Secretary to impose a monetary penalty in lieu of permanent disqualification under certain circumstances. § 344, 102 Stat. at 1664; *Ahmed*, 47 F. Supp. 2d at 391.

Section 2021(b)(3)(B) of 7 U.S.C. provides:

[D]isqualification ... shall be ... (3) permanent upon ... (B) the first occasion or any subsequent occasion of a disqualification based on the purchase of coupons or

trafficking in coupons…except that the Secretary shall have the discretion to impose a civil penalty of up to $20,000 for each violation…in lieu of disqualification under this subparagraph,… if the Secretary determines that there is substantial evidence that such store or food concern had an effective policy and program in effect to prevent violations of the chapter and the regulations, including evidence that—

>    (i) the ownership of the store or food concern was not aware of, did not approve of, did not benefit from, and was not involved in the conduct of the violation; and

>    (ii)(I)   the management of the store or food concern was not aware of, did not approve of, did not benefit from, and was not involved in the conduct of the violation; or

>    (II)   the management was aware of, approved of, benefited from, or was involved in the conduct of no more than 1 previous violation by the store or food concern…

The legislative history pertinent to § 2021(b) addressed the reasons for the inclusion of the civil money penalty as a possible sanction.  H.R. Rep. No. 100-828, pt. 1, at 27–28 (1988) states (emphasis added):

>    *The permanent disqualification of retail food stores upon the first trafficking offense—without any evaluation of preventive measures taken or complicity in the trafficking—seems excessively harsh.* The Committee substitute gives the Secretary of Agriculture the discretion to impose a fine of up to $20,000 on a retail or wholesale food store instead of disqualification. The Secretary may exercise that discretion—if it is determined that there is substantial evidence that the store had an effective policy and program to prevent these violations of the Food Stamp Act.

>    Examples of an effective policy and program to prevent violations of the Act or regulations by a store or concern might include the following: (i) effective written policies and procedures to be followed by store personnel that are consistently applied by management; (ii) initial training of store managers and employees in the proper handling of food stamps; (iii) periodic oversight and continuing education of store personnel in the proper handling of food stamps; and (iv) other reasonable and good faith efforts that demonstrate the existence of an effective policy and program by the store or concern to prevent violations of the act or regulations.

>    A retail food store or wholesale food concern which has an effective policy and program to prevent trafficking should not be presumptively disqualified from

participation in the Food Stamp Program due to the unauthorized or expressly prohibited acts of store personnel ....

However, innocent persons should not be subject to the harsh penalty of disqualification where a store or concern has undertaken and implemented an effective program and policy to prevent violations. The Secretary of Agriculture is directed to promulgate regulations consistent with the described amendment….

This provision provides [the Secretary with discretion]. The Act will retain strict penalties—fines can be imposed as well as disqualification from participation in the food stamp program. With Secretarial discretion, *we can be assured that the punishment will more closely fit the crime.*

The regulations implementing SNAP provide that FNS "shall...[d]isqualify a firm permanently if: (i) Personnel of the firm have trafficked as defined in [7 C.F.R.] § 271.2…." 7 C.F.R. § 278.6(e)(1)(i). A disqualification "shall result from a finding of a violation on the basis of evidence that may include facts established through on-site investigations, inconsistent redemption data, [or] evidence obtained through a transaction report under an electronic benefit transfer system…." 7 C.F.R. § 278.6(a); *see* 7 U.S.C. § 2021(a)(2); *AJS Petroleum, Inc. v. United States*, L-11-1085, 2012 WL 683538, at *1 (D. Md. Mar. 1, 2011). But, even if an authorized retailer is found to have trafficked in benefits, disqualification is not the only sanction. The FNS may impose a civil money penalty, in lieu of permanent disqualification, so long as it acts "in accordance with the provisions of § 278.6(i) and § 278.6(j)." 7 C.F.R. § 278.6(a).

To qualify for a CMP, however, the retailer must request this alternative penalty within ten days of receipt of the charge letter from FNS. *See* 7 C.F.R. § 278.6(b)(2)(iii). In addition, the retailer must submit "substantial evidence" showing that the retailer meets multiple criteria. *See Idias v. United States*, 359 F.3d 695, 697 (4th Cir. 2004); *Castillo v. United States*, 989 F. Supp. 413, 418 (D. Conn. 1997) ("All four of these criteria must be satisfied [by substantial evidence] in order to impose a [CMP].").

The criteria are as follows, 7 C.F.R. § 278.6(i):

Criterion 1. The firm shall have developed an effective compliance policy as specified in § 278.6(i)(1); and

Criterion 2. The firm shall establish that both its compliance policy and program were in operation at the location where the violation(s) occurred prior to the occurrence of violations cited in the charge letter sent to the firm; and

Criterion 3. The firm had developed and instituted an effective personnel training program as specified in § 278.6(i)(2); and

Criterion 4. Firm ownership was not aware of, did not approve, did not benefit from, or was not in any way involved in the conduct or approval of trafficking violations

The regulations provide for a system of administrative and judicial review of a decision by FNS to disqualify a SNAP retailer. *See* 7 U.S.C. § 2023(a); 7 C.F.R. § 279. First, FNS must provide the retailer with written notice of its initial decision. 7 U.S.C. § 2023(a)(1). Within ten days of receipt of the notice, the retailer may ask FNS to review the decision. *Id.* § 2023(a)(3); 7 C.F.R. § 279.1. FNS must then review its initial decision and render a Final Agency Decision, which takes effect thirty days after notice of the decision has been delivered to the retailer. 7 C.F.R. § 279.5. Upon receipt of a Final Agency Decision, a retailer may seek judicial review. 7 U.S.C. § 2023(a)(13); 7 C.F.R. § 279.7.

Notwithstanding the provisions authorizing a CMP under certain circumstances, the Agency seems to rely primarily on disqualification as an enforcement mechanism. Between 2015 and 2020, the USDA issued 9,271 permanent disqualifications for trafficking violations and a mere 26 CMPs. ECF 15 at 2-3 (citing ECF 15-1 (FNS Year End Summaries between 2015 and 2020)).

## II. Factual Background[4]

The Store became an authorized SNAP retailer on April 20, 2016. ECF 6 at 8. It serves a community in Maryland where approximately 16% of households receive SNAP benefits. ECF 1, ¶ 2. According to plaintiff, the Store began accepting EBT to "better serve the local community and increase its attractiveness to SNAP customers." *Id.* ¶ 3. SNAP customers have become a "substantial share of the store's total clientele," and account "for an even larger portion of the gross revenue" for the Store. *Id.*

The Store is a franchise. And, the parent corporation, 7-Eleven, Inc., requires its franchisees to qualify for SNAP in order to operate as a 7-Eleven convenience store. ECF 12-1 at 3. Therefore, if the Store is disqualified, it will be unable to continue as a 7-Eleven store. Additionally, 7-Eleven, Inc. imposes a fine of $697 per day for every day that the Store is not able to participate in the Program. ECF 10-1 at 16.

Between June 17, 2020 and June 27, 2020, an undercover USDA investigator made six visits to the Store to monitor the Store's compliance with SNAP regulations. ECF 10-2 at 5-17 (Investigation Reports).[5] The investigator interacted with one Store employee ("Employee 1") on four visits. *Id.* at 5, 8, 10, 12, 14. On two occasions, June 18, 2020 and June 22, 2020, the investigator discussed with Employee 1 the possibility of exchanging EBT benefits for cash at a future time. *Id.* at 8, 10. And, on a second occasion on June 22, 2020, and again on June 25, 2020, Employee 1 gave the investigator cash in exchange for EBT benefits. *See id.* at 5, 12, 14. But, at two other visits to the Store—June 17, 2020 and June 27, 2020—the investigator

---

[4] The facts are largely undisputed, and derive from the Complaint, the evidence presented at the Motion hearing, and the parties' submissions.

[5] The parties do not indicate what led the investigator to visit the Store.

interacted with a different Store employee ("Employee 2"), and that employee refused to exchange cash for SNAP benefits. *Id.* at 6, 16.

As to the events of June 18, 2020, the undercover FNS investigator asked Employee 1 for "cash back" on his SNAP EBT card. *Id.* at 8. Employee 1 told the investigator to "come back Sunday sometime after midnight and we can work something out." *Id.* The investigator returned on June 22, 2020, and "asked the clerk if he could still [get] cash back off [his] EBT cart." *Id.* at 10. Employee 1 "laughed and said 'Ah, I remember you from the other night, I thought you forgot. How much are you looking for?'" *Id.* The investigator responded: "I just need twenty or thirty bucks." Employee 1 said "Okay, it's a little too busy right now but come between 2:00 A.M. to 3:00 A.M. when the store is slower." *Id.*

The investigator returned to the Store, as suggested by Employee 1. *Id.* at 12. The investigator reported, *id.*:

> I entered the subject store and asked the clerk if he was ready to give me cash off my EBT card. The clerk [i.e., Employee 1] said "yes, follow me." The clerk then mentioned he would keep $50.00 dollars of my EBT benefits for himself. The clerk then gathered several packages of candy and proceeded to ring them up. After several minutes, the clerk asked me to swipe by EBT card for the items. The clerk then charged me $80.00 for all the items. The clerk then bagged all of the items and placed the receipt in the bag and placed the items that he rang up on the rear counter and opened the register. The clerk then retrieved approximately $90.00 (4-$20.00, 2-$5.00) from the cash register. The clerk took $60.00 (3-$20.00) bills for himself and placed them in in [sic] pocket. The clerk handed me $30.00 (1-$20.00, 2-$5.00) which he removed from the register. I then asked the clerk when he usually works. The clerk responded "Sunday to Friday from 9:00 P.M. to 7:00 A.M." I responded "Ok, maybe I'll stop [sic] another day and we can do it again." The clerk said "No problem, come around the same time."

Three days later, the investigator returned to the Store and again interacted with Employee 1. *Id.* at 14. The investigator reported, *id.*:

> I entered the subject store and asked the clerk if he could still give me cash back off my EBT card. The clerk said "of course." The clerk gathered several snack items and proceeded to ring them up. The clerk then asked "how much do you

want?" I responded "about $10 to $15 dollars should do." The clerk then said "okay." After the clerk rang the items up, the clerk told me to swipe the card. I then asked the clerk if it was okay to add a few items. The clerk then said "that's fine but I'm still going to charge you the same." I responded "okay." The clerk opened the cash register and withdrew (2-$5.00) bills. The clerk then asked asked [sic] an additional clerk….do he [sic] have $5.00. The additional clerk said "yes, give me one second." The additional clerk then withdrew (5-$1.00 bills) from an unknown area behind the counter and handed it to the clerk. The clerk then bagged all of the items except the two items I purchased in a bag and placed it on the counter behind the cash register. The clerk then handed me $15.00 (2-$5.00, 5-$1.00) which he withdrew the (2-$5.00) from the register and retrieved (5-$1.00) from the additional clerk.

The report also includes details of transactions when no violations occurred. On June 17, 2020, for instance, the investigator reported, *id.* at 6: "I entered the subject store, placed all items on the counter, and presented the EBT card to the clerk [i.e., Employee 2] for purchase. The clerk removed the non-food items and stated that they could not be purchased using SNAP benefits. I asked the clerk to utilize the EBT card for the non-food items and the clerk refused. The clerk then completed the transaction for the food items only."

Similarly, as to June 27, 2020, the investigator stated, *id.* at 16: "I entered the subject store, placed all items on the counter, and presented the EBT card to the clerk [i.e., Employee 2] for purchase. The clerk removed the non-food items and stated that they could not be purchased using SNAP benefits. I asked the clerk to utilize the EBT card for the non-food items and the clerk refused. The clerk then completed the transaction for the food items only."

FNS issued a "Charge Letter" to plaintiffs on August 6, 2020, charging the Store with "trafficking, as defined in Section 271.2 of the SNAP regulations." ECF 10-2. The Charge Letter warned that the "sanction for the trafficking violation(s)…is permanent disqualification." *Id.* But, it explained that, "under certain conditions, FNS may impose a civil money penalty (CMP) of up to $59,000.00 in lieu of permanent disqualification" if, within ten days of receipt of the letter, the retailer provided documentation showing that it met certain regulatory requirements. *Id.*

Mr. Rashid, through counsel, responded to the Charge Letter on August 17, 2020, requesting a CMP in lieu of permanent disqualification. ECF 12-1 ("CMP Request"). The CMP request stated: "Mr. Rashid is able to meet the criteria specified in the regulations." *Id.* at 1. In support of the request for a CMP, counsel described the SNAP compliance policies of the parent franchisor, 7-Eleven, Inc., and its online SNAP training program, which franchise employees are required to complete. *Id.* at 1-3. Counsel also explained that the Store uses the "7-Eleven Point of Sale (POS) system" which "automates much of the process to preempt the possibility of employee non-compliance." *Id.* at 2. As a result, counsel noted, "there is not much training or auditing needed to ensure that employees are following the policies concerning sorting eligible items, properly processing refunds, or refusing cash back transactions, as the POS system is deigned to be in compliance with the law at all times." *Id.* at 2-3.

In addition, the CMP Request included screenshots of the 7-Eleven University training program relating to SNAP, which is a corporate training program; copies of employee training acknowledgement forms showing initial training of Store employees and retraining of employees after the violations occurred; the USDA Snap Retailer Guide; and photos of warnings on display in the Store regarding SNAP rules. *Id.* at 1-2; *see* ECF 10-7 to ECF 10-17; ECF 6 at 6. According to the CMP Request, the submission "shows that the online tutorial was in effect prior to the violations." ECF 12-1 at 2.

As to the posters, five were displayed throughout the Store, admonishing that the penalty for engaging in EBT trafficking is imprisonment or a fine. *See* ECF 10-17. Specifically, posters were placed on the front door of the store, *id.* at 2; on the "Team Communication Board," *id.* at 4; in the employee stock room, *id.* at 5; on a bulletin board that also had the employee shift schedule, *id.* at 6; and by the cash registers. *Id.* at 7; *see* ECF 12-1 at 2. In addition, the SNAP

retailer guide was placed behind the counter between the cash registers. *See* ECF 10-17 at 8. The posters are dated July 2013, *see* ECF 10-17 at 9, and the SNAP retailer guide is dated January 2018. ECF 12-1 at 1-2.

The Store also provided employee training acknowledgement forms, which documented SNAP and other training of Store employees after they were hired. Of relevance, the forms provided that the employees acknowledged having "successfully completed" a training module about SNAP. *See, e.g.*, ECF 10-16 at 1. Further, the forms stated, *id.*: "I understand how the information presented in these modules should be applied to the safe and legal completion of my duties. I agree to implement the recommendations and guidelines in these modules to the best of my abilities, and in compliance with all regulations."

Further, counsel wrote: "Mr. Rashid believes that the effectiveness of the training is evident by the fact that the other employees followed the law as instructed when the inspector visited. Mr. Rashid appreciates you making him aware of the rogue employee who committed SNAP trafficking in his store because otherwise he would still be unaware of this employee's dishonesty…." ECF 12-1 at 3. And, counsel maintained: "[T]here is no evidence of any consistent trafficking operation going on at this location which would warrant permanent disqualification." *Id.*

The CMP Request also commented on the hardship that would result from a sanction of permanent disqualification. Noting that 7-Eleven requires franchisees to qualify for SNAP, counsel pointed out that if the Store is permanently disqualified from participating in SNAP, "the 7-Eleven policy is that [Mr. Rashid] will lose the franchise," which "is the only source of income he has to support his family." *Id.*  The letter also stated that a permanent disqualification of the

Store "would impose a hardship on [Mr. Rashid's] customers" because the Store is "located in a very poor neighborhood" with very few food options. *Id.* at 4.

Notably, Employee 1 was hired in January 2020 and completed his training about two weeks after he was hired. *See* ECF 10-16 at 4. Relatively soon thereafter, *i.e.*, about six months after Employee 1 finished his training, Employee 1 committed the trafficking violations. The regulations do not specify that the required periodic retraining must occur within six months of the initial training. In any event, on August 13, 2020, Employee 1 was discharged from employment at the Store, based on the conduct at issue. ECF 12-1 at 2, 3.

Thereafter, by letter of October 27, 2020, the Retailer Operations Division ("ROD") of FNS notified plaintiffs that the Store was permanently disqualified from participating as an authorized retailer in SNAP because of its trafficking violations. ECF 12-2 at 3.[6] According to ROD, the Store was not eligible for a CMP because it failed to submit sufficient evidence to demonstrate that it had established and implemented an effective compliance policy and training program to prevent violations of SNAP. *Id.*

Plaintiffs appealed ROD's determination by letter of October 29, 2020, and requested an administrative review. ECF 12-2 at 3. The appeal was conducted by the Administrative Review Branch of FNS. ECF 12-2. An Administrative Review Officer ("ARO") issued the "Final Agency Decision" on December 23, 2020. ECF 6.

The ARO reviewed the FNS investigation report, an affidavit from Rashid with contentions as to the Store's compliance policies and training program, and the documents that were provided with the Store's original response to the charges. *Id.* at 6-7. The FAD upheld the finding that trafficking had occurred and the sanction of permanent disqualification. In particular,

_____

[6] The parties did not provide the Court with the letter from ROD.

the FAD stated that the investigation report "documents that SNAP violations were committed during three of the compliance visits" that were conducted between June 17 and June 27, 2020. ECF 6 at 6.

As to the Store's request for a CMP, the FAD reviewed the criteria for a CMP in lieu of disqualification. *Id.* at 9-10. The ARO acknowledged that plaintiffs' counsel "timely requested a CMP and also provided documentation in support of its request." *Id.* at 10. The ARO noted that the Store submitted, *inter alia*, training certifications and training documents "from a refresher training conducted after the violations occurred"; a training that "occurred after employees were hired"; a "copy of signage that is posted at the" Store; and "screen shots of the training provide[d] by the 7-Eleven University." *Id.* But, the ARO stated, *id.*:

> The Retailer Operations Division determined that the information submitted was insufficient. There was no evidence of internal review of employee compliance with the SNAP regulations…. In addition, although Appellant provided documentation of employee training upon hire, there was no documentation to show that employees were periodically trained after the initial training as required by 7CFR 278.6(i)(2)(i). The only subsequent training was after the violations occurred. Initial training was conducted more than 13 years ago for one employee with no evidence of refresher training.
>
> The standard of substantial evidence is difficult to meet. Nevertheless, such is the standard required by the regulations, and to which Appellant is held during the course of this review. Appellant fell short of the regulatory standard for a trafficking CMP as it did not provide substantial evidence that it met all four criteria required by 7 CFR §278.6(i). Therefore, Retailer Operations' decision not to impose a trafficking CMP in lieu of disqualification is sustained.

Plaintiffs sought judicial review of the Final Agency Decision by filing suit in this Court on January 8, 2021. ECF 1. The Motion followed on May 13, 2021.

At the Motion hearing, plaintiff presented three witnesses: Aref Alshameri, the Store manager, who has worked at the Store for over 13 years; Neazur Rahman, a Store employee who

was hired in January 2020; and Mr. Rashid, the plaintiff and the franchise owner.[7] Mr. Alshameri explained that, in addition to initial training as to SNAP, he informally trains employees as to the SNAP rules as he works with them, making sure they follow the rules. He also stated that he continually talks to the employees about what items are eligible for SNAP benefits. Mr. Rahman affirmed that he was trained on the SNAP rules after being hired in January 2020 and that he understood that he was not allowed to give cash back in exchange for SNAP benefits.

During his testimony, Mr. Rashid discussed the Store's point-of-sale computer system. This system ensures that only eligible items are obtained with the EBT. Further, he explained that, in addition to the new hire training, employees are retrained as they work, on an ad hoc basis, particularly when there are changes to the SNAP rules. He noted that he does not document when these retrainings take place because they happen verbally and informally.

Additional facts are included, *infra*.

### III.      Standard of Review

### A. Preliminary Injunction

Plaintiffs seek a preliminary injunction pursuant to 7 U.S.C. § 2023(a)(17) and Rule 65 of the Federal Rules of Civil Procedure. ECF 10 at 1.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see Benisek v. Lamone*, ____ U.S. ____, 138 S. Ct. 1942, 1944 (2018); *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, __ F.3d__, 2021 WL 2584408, at *6 (4th Cir. June 24, 2021) (en banc); *Roe v. Dep't of Defense*, 947 F.3d 207, 219 (4th Cir. 2020); *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159,

---

[7] The testimony from Mr. Alshameri and Mr. Rahman was somewhat limited because of language challenges with both witnesses.

170-71 (4th Cir. 2019); *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 188 (4th Cir. 2013) (en banc). Rather, a preliminary injunction is "'granted only sparingly and in limited circumstances.'" *Micro Strategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991)). "This principle reflects the reality that courts are more likely to make accurate decisions after the development of a complete factual record during the litigation." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 979 F.3d 219, 225 (4th Cir. 2020), *rev'd on other grounds*, 2021 WL 2584408 (4th Cir. June 24, 2021).

To qualify for a preliminary injunction under Rule 65, a plaintiff bears the burden to satisfy four requirements. First, a plaintiff "must establish that he is likely to succeed on the merits[.]" *Winter*, 555 U.S. at 20. Although that standard does not require "a 'certainty of success,'" the plaintiff "must make a clear showing that he is likely to succeed at trial.'" *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citation omitted). However, "a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek*, 138 S. Ct. at 1943-44 (citing *Winter*, 555 U.S. at 32). "Rather, a court must also consider whether the movant has shown 'that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Benisek*, 138 S. Ct. at 1943-44 (quoting *Winter*, 555 U.S. at 20, 129 S. Ct. 365); *see Leaders of a Beautiful Struggle*, 2021 WL 2584408, at *6; *Centro Tepeyac*, 722 F.3d at 188.[8]

---

[8] The irreparable harm factor is satisfied if there is a likely constitutional violation. *Leaders of a Beautiful Struggle*, 2021 WL 2584408, at *12. Moreover, when a state is precluded from enforcing restrictions that are likely to be deemed unconstitutional, then "the balance of the equities favors preliminary relief . . . ." *Id.* (citing *Centro Tepeyac*, 722 F.3d at 191; *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)).

A preliminary injunction cannot issue absent a "clear showing" that all four requirements are satisfied. *Leaders*, 979 F.3d at 226; *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013). And, the "'[p]laintiff bears the burden of establishing that each of these factors supports granting the injunction.'" *Direx Israel*, 952 F.2d at 812 (quoting *Tech. Publ'g Co. v. Lebhar-Friedman, Inc.*, 729 F.2d 1136, 1139 (7th Cir. 1984); *Shaffer v. Globe Prod, Inc.*, 721 F.2d 1121, 1123 (7th Cir. 1983)); *see Winter*, 555 U.S. at 22 (recognizing that because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that plaintiff is entitled to such relief"). Accordingly, a court need not address all four *Winter* factors if one or more factors is not satisfied. *Henderson ex rel. NLRB*, 902 F.3d at 439.

Notably, the Food Stamp Act provides that a court may temporarily stay administrative action pending trial upon consideration of only two factors: (1) the likelihood of prevailing on the merits and (2) irreparable harm. 7 U.S.C. § 2023(a)(17); *see E. Vill. New Deli Corp. v. United States*, No. 20 CIV. 7356 (PAE), 2021 WL 533522, at *3 (S.D.N.Y. Feb. 12, 2021); *Faisal & A, LLC v. United States*, No. 2:19-CV-14184, 2019 WL 4674500, at *3 (S.D. Fla. Sept. 25, 2019); *Ahmed v. United States*, 47 F. Supp. 2d 389, 393 (W.D.N.Y. 1999); *Castillo v. United States*, 989 F. Supp. 413, 417 (D. Conn. 1997); *Young Jin Choi v. United States*, 944 F. Supp. 323, 325 (S.D.N.Y. 1996).

Some district courts have found that a stay is not available in cases of permanent disqualification for trafficking, pursuant to 7 U.S.C. § 2023(a)(18). *See, e.g., Kajjy v. United States*, No. 17-CV-51-L(NLS), 2018 WL 747676, at *4 (S.D. Cal. Feb. 6, 2018); *Ilaian v. United States Dept. of Agric.*, 87 F. Supp. 2d 1047, 1047 (S.D. Cal. 2000). However, as discussed, *infra*, for the purpose of this case, the government does not contest plaintiffs' right to seek a stay. ECF

12 at 7. Moreover, the government agreed to a stay of disqualification pending this Court's ruling on the Motion.

"Because preliminary injunction proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725–26 (4th Cir. 2016), *vacated on other grounds*, __ U.S. __, 137 S. Ct. 1239 (2017); *see Profiles, Inc. v. Bank of Am. Corp.*, 453 F. Supp. 3d 742, 753 (D. Md. 2020).

## B. Review of the Agency Decision

Under 7 U.S.C. § 2023(a)(13), a SNAP authorized retailer may obtain judicial review of its disqualification by filing suit in federal district court within 30 days after delivery of the final determination notice. Judicial review of an administrative disqualification involves a two-part inquiry.

First, the district court "shall [conduct] a trial de novo" to "determine the validity" of the FNS's finding that the retailer violated SNAP regulations. *Id.* § 2023(a)(15). In the context of SNAP, de novo review means that the retailer bears the ultimate burden of proving by a preponderance of the evidence that the alleged violations did not occur. *AJS Petroleum*, 2012 WL 683538, at *4. To carry this burden, the plaintiff "may offer any relevant evidence available to support his case, whether or not it has been previously submitted to the agency." *Redmond v. United States*, 507 F.2d 1007, 1012 (5th Cir. 1975). Thus, in reviewing the agency decision, "the court is not bound by the administrative record . . . ." *Green Apple Grocery and Deli v. United States Dep't of Agriculture*, RDB-19-1408, 2021 WL 533730, at *5 (D. Md. Feb. 12, 2021); *see*

*AJS Petroleum*, 2012 WL 683538, at *4 ("In seeking to disprove the violations, [the retailer] is not limited to the factual record before the agency, but may rely on other evidence as well.") (citing *Kim v. United States*, 121 F.3d 1269, 1272 (9th Cir. 1997)); *see also Negash v. United States*, RDB-17-1954, 2018 WL 722481, at *3 (D. Md. Feb. 5, 2018), *aff'd*, 772 F. App'x 34, 35-36 (4th Cir. 2019) (per curiam); *Mahmood v. United States*, WMN-12-0228, 2012 WL 3038638, at *2 (D. Md. July 24, 2012).

Second, courts apply the "arbitrary and capricious" standard to assess the validity of the sanction. *Betefsa, Inc. v. United States*, 410 F. Supp. 3d 132, 138 (D.D.C. 2019) ("Although the validity of the underlying violation is reviewed by trial de novo, 'judicial review of the agency's choice of penalty is focused on whether the [FNS] abused [its] discretion.'"); *see Cross v. United States*, 512 F.2d 1212, 1215 (4th Cir. 1975) (noting that the scope of judicial review extends to the administrative sanction); *see, e.g., Negash*, 2018 WL 722481, at *3; *Mahmood*, 2012 WL 3038638, at *2; *AJS Petroleum*, 2012 WL 683538, at *4; *2341 E. Fayette St., Inc. v. United States*, JFM-05-974, 2005 WL 2373696, at *1 (D. Md. Sept. 26, 2005) (citing *Willy's Grocery v. United States*, 656 F.2d 24, 26 (2nd Cir. 1981)); *see also Goldstein v. United States*, 9 F.3d 521, 523 (6th Cir. 1993); *Bruno's, Inc. v. United States*, 624 F.2d 592, 594 (5th Cir. 1980). "The arbitrary and capricious standard asks 'whether the determination is unwarranted in law or without justification in fact.'" *Mahmood*, 2012 WL 3038638, at *2 (quoting *Ahmed*, 47 F. Supp. 2d at 393); *see Affum v. United States*, 566 F.3d 1150, 1161 (D.C. Cir. 2009) ("Under the applicable standard of review, the Secretary abuses his discretion in his choice of a penalty if his decision is either 'unwarranted in law' or 'without justification in fact'….") (internal citation omitted).

"Thus, in a case such as this, the District Court obviously must consider, *inter alia*, whether the Secretary reasonably weighed the statutory factors listed in § 2021(b)(3)(B), (B)(i), (B)(ii)(I), and (B)(ii)(II) and reasonably applied any lawful regulations adopted pursuant to § 2013(c) and § 2021(a)(2)…in denying [plaintiff's] request for a civil money penalty in lieu of disqualification." *Affum*, 566 F.3d at 1161-62.

## IV.     Discussion

### A.

In the Motion, plaintiffs do not dispute the determination that the Store engaged in SNAP trafficking. ECF 10-1 at 11. Rather, plaintiffs challenge the penalty of permanent disqualification, on the grounds that the sanction is arbitrary and capricious and will result in irreparable injury. *Id.*

With respect to the Motion, the government "does not contest whether a stay is available to a retailer who trafficked." ECF 12 at 7. Nor does it contest that plaintiffs would experience irreparable injury if an injunction is not issued. *Id.* Rather, the government argues that "a stay is not warranted because Plaintiffs are unlikely to succeed on the merits of their case." *Id.* In particular, the government maintains that plaintiffs "cannot seriously dispute that the violations occurred and they cannot present 'substantial evidence' of satisfactory training to justify imposition" of a CMP in lieu of permanent disqualification. *Id.* Notably, with regard to training, the government does not challenge the adequacy of the Store's initial training, when an employee is first hired. Rather, the government focuses on the failure of plaintiffs to demonstrate adequate periodic retraining.

Because plaintiffs do not contest the Department's determination that trafficking occurred, and because the government does not dispute irreparable harm, the central question

remaining at this juncture is whether plaintiffs are likely to succeed on their claim that the USDA was arbitrary and capricious in imposing a penalty of permanent disqualification, rather than a CMP.

Permanent disqualification is the presumptive sanction where a retailer has trafficked in SNAP benefits. *See* 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i); *Idias*, 359 F.3d at 697; *see also Green Apple Grocery*, 2021 WL 533730, at *7 ("Permanent disqualification is almost always the appropriate sanction where a retailer is caught trafficking in SNAP benefits."). Indeed, "a store that is caught trafficking in food stamps even one time must be permanently disqualified from [SNAP], unless the Secretary of Agriculture determines that the store had in place an effective anti-trafficking policy." *Idias*, 359 F.3d at 697 (citing 7 U.S.C. § 2021(b)(3)(B)); 7 C.F.R. § 278.6(e)(1)(i)).  In *Negash*, 772 F. App'x at 35, the Fourth Circuit reiterated: "'Congress has been quite firm in ensuring that [SNAP benefits] are used only to purchase eligible food items, and are not exchanged for cash or other things of value.'"  (Citation omitted).

But, the Agency has discretion to impose a CMP instead of a penalty of permanent disqualification where a retailer demonstrates, with substantial evidence, that it had established and implemented an effective compliance policy and program to prevent SNAP violations. *See* 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(i); *Green Apple Grocery*, 2021 WL 533730, at *7.  To review, the four criteria that the retailer must establish to be considered for a CMP are as follows, 7 C.F.R. § 278.6(i):

> Criterion 1. The firm shall have developed an effective compliance policy as specified in § 278.6(i)(1); and
>
> Criterion 2. The firm shall establish that both its compliance policy and program were in operation at the location where the violation(s) occurred prior to the occurrence of violations cited in the charge letter sent to the firm; and

Criterion 3. The firm had developed and instituted an effective personnel training program as specified in § 278.6(i)(2); and

Criterion 4. Firm ownership was not aware of, did not approve, did not benefit from, or was not in any way involved in the conduct or approval of trafficking violations

Under § 278.6(i)(1), "in determining whether a firm has established an effective policy to prevent violations, FNS shall consider written and dated statements of firm policy which reflect a commitment to ensure that the firm is operated in a manner consistent with" the regulations. Further, § 278.6(i)(1) provides, in part, *id.* (emphasis added):

    (i) Criteria for eligibility for a civil money penalty in lieu of permanent disqualification for trafficking….

***

    (1) Compliance policy standards…. In addition, in evaluating the effectiveness of the firm's policy and program to ensure FSP compliance and to prevent FSP violations, **FNS may consider** the following:

    (i)    Documentation reflecting the development and/or operation of a policy to terminate the employment of any firm employee found violating FSP regulations;

    (ii)    Documentation of the development and/or continued operation of firm policy and procedures resulting in appropriate corrective action following complaints of FSP violations or irregularities committed by firm personnel;

    (iii)    Documentation of the development and/or continued operation of procedures for internal review of firm employees' compliance with FSP regulations;

    (iv)    The nature and scope of the violations charged against the firm;

    (v)    Any record of previous firm violations under the same ownership; and

    (vi)    Any other information the firm may present to FNS for consideration.

Further, to satisfy Criterion 3, 7 C.F.R. § 278.6(i)(2) provides (emphasis added):

(2) Compliance training program standards. As prescribed in Criterion 3 above, the firm shall have developed and implemented an effective training program for all managers and employees on the acceptance and handling of food coupons in accordance with this part 278. A firm which seeks a civil money penalty in lieu of a permanent disqualification **shall document its training activity by submitting to FNS its dated training curricula and records of dates training sessions were conducted**; a record of dates of employment of firm personnel; and contemporaneous documentation of the participation of the violating employee(s) in initial **and any follow-up training held prior to the violation(s)**. FNS shall consider a training program effective if it meets **or is otherwise equivalent to the following standards**:

(i)     Training for all managers and employees whose work brings them into contact with SNAP benefits or who are assigned to a location where SNAP benefits are accepted, handled or processed shall be conducted within one month of the institution of the compliance policy under Criterion 1 above. Employees hired subsequent to the institution of the compliance policy shall be trained within one month of employment. **All employees shall be trained periodically thereafter**;

(ii)    Training shall be designed to establish a level of competence that assures compliance with Program requirements as included in this part 278;

(iii)   Written materials, which may include FNS publications and program regulations that are available to all authorized firms, are used in the training program….

In moving for a preliminary injunction, plaintiffs assert that the evidence shows that the Store "meets all four criteria" to be considered for a CMP. ECF 10-1 at 12-15. The government does not dispute that plaintiffs satisfy the fourth criteria, noting that the "Agency does not allege that management was aware of, benefitted from, or was involved in the trafficking." ECF 12 at 9. The government also concedes that the content of the Store's training material is sufficient as to the SNAP rules and that the Store satisfactorily trained its employees immediately after they were hired, in partial satisfaction of Criterion 3. But, it maintains that plaintiffs fail to satisfy "the remaining three criteria" of 7 C.F.R. § 278.6(i), "because they lack documentation of a compliance policy, and the training documentation they submitted proves that [follow-up] training did not occur at the required frequency." ECF 12 at 9.

In my view, plaintiffs' evidence is sufficient at this juncture to show that it had an effective compliance policy in place prior to the violations, that it provided the Store's employees with initial training about SNAP, and it subsequently provided informal, periodic retraining thereafter. Moreover, plaintiffs have shown that they are likely to establish that FNS's decision to permanently disqualify the Store was arbitrary and capricious.

**B.**

As to the compliance policy, plaintiffs provided documentation of the 7-Eleven University training program, pertaining to initial training of new hires, as well as the multiple posters that were displayed in conspicuous locations around the Store, warning about the need to comply with the Program's rules. ECF 10-7 to ECF 10-14; ECF 10-17. The training program and posters provide information, *inter alia*, on how to process SNAP transactions and the items that are eligible for EBT. They also make it clear that the exchange of benefits for cash is prohibited and that the violation of SNAP regulations is a criminal offense. And, employee acknowledgement forms indicate that the initial employee training, and thus the policies pertaining to the training, were in place well in advance of the violations in this case. *See* ECF 10-15.

Additionally, the automated, sophisticated point-of-sale system used by the Store is significant. It helped to assure that only eligible SNAP items could be purchased with an EBT card.

Accordingly, plaintiffs demonstrated that the Store had a policy in place concerning SNAP regulations, and it preceded the violations, as required under Criteria 1 and 2. *See Shreegi Enterprises, Inc. v. United States*, 1:CV-15-2232, 2018 WL 1919576, at *30 (M.D. Pa. Apr. 24, 2018) (finding that Criterion 1 and Criterion 2 may "be satisfied by the training manual, which

can serve as a written and dated statement of firm policy regarding its commitment to enforcing SNAP regulations" and "shows that the compliance policy and program were in effect before the violations").

As to the compliance policy, the FAD stated, ECF 6 at 10: "There was no evidence of internal review of employee compliance with the SNAP regulations." But, under 7 C.F.R. § 278.6(i)(1), "[d]ocumentation of the development and/or continued operation of procedures for internal review of firm employees' compliance with FSP regulations" is just *one factor* that the FNS *may consider* in determining whether the Store had an effective compliance policy under Criteria 1. *Id. See Affum*, 566 F.3d at 1161 (noting that a sanction is arbitrary or capricious if it is unwarranted in law).

In determining whether a retailer has an effective compliance policy, the regulations also allow the FNS to consider: 1) "The nature and scope of the violations charged against the firm" 2) "Any record of previous firm violations under the same ownership or management"; and 3) "Any other information the firm may present to FNS for consideration." 7 C.F.R. §§ 278.6(i)(1)(iv)-(vi); *see Castillo*, 989 F. Supp. at 418 ("Although the regulatory criteria for proving an effective compliance policy and program appears to favor written documentary evidence of the compliance policies, the regulations allow other types of evidentiary submissions.") (citing 7 C.F.R. § 278.6(i)).

It is not clear from the FAD whether the ARO considered the posters or the corporate training material in determining whether plaintiffs satisfied both Criteria 1 and Criteria 2. Additionally, the information presented to the Agency, and at the hearing, established that the Store relied on modern technology – a point-of-sale computer system – to assure that only eligible items were obtained with the EBT. Given that the system prevented the sale of ineligible

items, it was akin to a compliance program. Yet, it does not appear that the ARO considered the Store's effort to use such technology to assure compliance with SNAP. *See* ECF 6 at 9-10.

The ARO acknowledged that the occurrence of trafficking in June 2020 constituted the Store's first such violation. ECF 12-2 at 7. In fact, as of June 2020, the Store had operated for about 16 years, without a single incident of SNAP misconduct. Moreover, on two occasions in June 2020, Employee 2 refused to allow the FNS investigator to exchange benefits for cash. These facts indicate not only that the Store had a compliance policy, but that it was effective.

During the first violation in June 2020, the USDA investigator exchanged $80 in SNAP benefits for $30 in cash. During the second violation, the agent exchanged $39.48 in benefits for $15 in cash. *See* ECF 10-2 at 5. Thus, the violations amounted to less than $150 in trafficked benefits. Nevertheless, the ARO stated: "[A] record of participation in the SNAP with no previously documented instance of violations does not constitute valid grounds for dismissal of the current charges of violation or for mitigating the impact of the violations upon which they are based. There is no provision in the Act or regulations that reverses or reduces a sanction based upon a lack of prior violations by a firm and its owners…." *Id.*

But this is not quite correct. The ARO's failure to weigh the extent of the trafficking violations, coupled with the Store's long history of compliance, appears to be in contravention of 7 C.F.R. §§ 278.6(i)(1)(iv) and (v). These provisions indicate that the FNS *may* consider a retailer's prior record as well as the nature of the violations charged.

### C.

The central dispute concerns Criterion 3, which governs the ongoing training of Store personnel. In relevant part, 7 C.F.R. § 278.6(i)(2) states, in part (emphasis added):

> (2) Compliance training program standards…. A firm which seeks a civil money penalty in lieu of a permanent disqualification **shall document its training**

**activity by submitting to FNS its dated training curricula and records of dates training sessions were conducted**; a record of dates of employment of firm personnel; and contemporaneous documentation of the participation of the violating employee(s) in initial **and any follow-up training held prior to the violation(s)**. FNS shall consider a training program effective if it meets **or is otherwise equivalent to the following standards**:

(i)        Training for all managers and employees…shall be conducted…. within one month of employment. **All employees shall be trained periodically thereafter**….

It is undisputed that plaintiffs provided documentation of initial training.  Thus, the focus concerns the periodic retraining.  Whether plaintiffs satisfied the regulation depends, to some extent, on the interpretation of the text of 7 C.F.R. § 278.6(i)(2).  This implicates principles of regulatory construction.[9]

Regulations promulgated pursuant to notice and comment are analyzed in accordance with the principles set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See, e.g., Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 165–75 (2007); *Christensen v. Harris County*, 529 U.S. 576, 586-88 (2000); *Auer v. Robbins*, 519 U.S. 452, 457–58 (1997). An agency's interpretation of regulations, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore v. Swift & Co*., 323 U.S. 134, 140 (1944); *see Christensen*, 529 U.S. at 587; *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 356 n.2 (4th Cir. 2011); *Monahan v. County of Chesterfield, Va.*, 95 F.3d 1263, 1272 n.10 (4th Cir. 1996).

However, deference to an agency's interpretation does not apply unless the regulation is "genuinely ambiguous." *Kisor v. Wilkie*, __ U.S. __, 139 S. Ct. 2400, 2415 (2019); *see Romero v. Barr*, 937 F.3d 282, 291 (4th Cir. 2019).  Moreover, to be entitled to deference, a reasonable

---

[9] The parties did not brief the rules of regulatory construction.

agency interpretation must be the agency's "'authoritative'" or "'official'" position. *Kisor*, 139 S. Ct. at 2416 (citation omitted). The interpretation must "in some way implicate [the agency's] substantive expertise." *Id.* at 2417. And, the interpretation must reflect a "'fair and considered judgment.'" *Id.* (citation omitted).

Before "concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction." *Id.* at 2415 (citation omitted). To do so, the "court must carefully consider the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on." *Id.* (internal quotes omitted). "If uncertainty does not exist, there is no plausible reason for deference. The regulation then just means what it means—and the court must give it effect, as the court would any law." *Id.* And, even if the regulation is ambiguous, the "agency's reading must still be reasonable." *Id.* (internal quotes omitted). "In other words, it must come within the zone of ambiguity the court has identified after employing all of its interpretive tools." *Id.* at 2415-16.

Under the traditional tools of construction, the task of interpreting a regulation, like a statute, starts with the text. *See Murphy v. Smith*, __ U.S. __, 138 S. Ct. 784, 787 (2018) ("As always, we start with the specific [] language in dispute."). Construing regulations "is a holistic endeavor, and at a minimum must account for [its] full text, language as well as punctuation, structure, and subject matter. *U.S. Nat. Bank of Oregon v. Independent Ins. Agents of America, Inc.*, 508 U.S. 439, 455 (1993) (internal quotes omitted). And, terms that are not defined are "'interpreted as taking their ordinary, contemporary, common meaning.'" *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (citation omitted); *accord United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020).

As to retraining, the FAD stated that the Store did not provide documentation "to show that employees were periodically trained after the initial training as required by" 7 C.F.R. § 278.6(i)(2)(i)). ECF 6 at 10.  And, the government contends that the Store did not provide documentation of "periodic retraining."  ECF 12 at 10.  In its opposition and at the hearing, the government urged the Court to interpret 7 C.F.R. § 278.6(i)(2), which requires a retailer to provide "dated training and curricula and records of dates training sessions" for initial training, as also applicable to retraining. ECF 12 at 10. In other words, according to the government, the periodic retraining must satisfy the same standards required for new hire trainings. Against that yardstick, plaintiffs' retraining fell short, according to the government.  And, in any event, the government contends that the affidavit of Mr. Rashid is not sufficient to provide proof of retraining.

In response, plaintiffs assert that "the regulation is vague as to when the retrainings need to occur, or what form they need to be in." ECF 15 at 5 (citing 7 C.F.R. § 278.6(i)(2)(i)). According to plaintiffs, "it appears reasonabl[e] that the regulation was intended to provide some flexibility in how the training and compliance is manifested in the evidence and…the retailer really only need[s] to show that it was there." *Id.*

In my view, the government's reading of the regulation expands the text of § 278.6(i)(2). At the hearing, the government cited one case—*Traficanti v. United States*, 227 F.3d 170 (4th Cir. 2000)—to support its argument.[10] In particular, the government relies on the following statement in *Traficanti*:  "Store owners cannot simply attest to having effective antifraud programs; rather, they must prove it." *Id.* at 174-176. According to the government, this

---

[10] The government did not cite this case in its briefing.  But, it relied on the case at the hearing.

statement indicates that the text of the regulation requires more than an affidavit of an owner to prove that a retailer conducted periodic retraining.

But, *Traficanti* is distinguishable. The store owner in *Traficanti* failed to provide evidence as to *any* training, including new hire training. *Id.* at 175 ("[The store owner] submitted *no documentation* to show that he met the four criteria mandated by the regulations.") (emphasis added). Thus, it is not clear whether the ruling in *Traficanti* applies broadly to all training, including retraining, or merely to new hire training.

Unlike in *Traficanti*, the Store submitted ample material to document its initial training program. In fact, as indicated, the parties agree that the Store sufficiently demonstrated that its employees received adequate and timely new hire training with regard to SNAP.

Considering the "text, structure, history, and purpose of" § 278.6(i)(2), I am persuaded that the regulation is not ambiguous as to retraining. *See Kisor*, 139 S. Ct. at 2415; *Astoria Downtown Market v. United States*, 3:18-cv-01367-AC, 2019 WL 7630953, at *5-7 (D. Or. Dec. 16, 2019) (finding no ambiguity in another provision of the SNAP regulations after considering "the text, structure, history and purpose of" the provision). As I see it, the requirements for initial training do not extend to retraining. To reach the conclusion urged by the government would require the Court to add terms that do not appear in the text. Rather, the provision provides for some measure of flexibility in how retailers can satisfy the requirement for retraining.

The first clause of § 278.6(i)(2) states that the retailer "shall document its training activity," but it does not expressly specify that it is a requirement for new hire training as well as retraining. In the third clause of the same paragraph, the text specifically provides that FNS seeks "contemporaneous documentation" as to "initial and follow-up training" for a "*violating*

*employee*," prior to the violation. 7 C.F.R. § 278.6(i)(2) (emphasis added). In other words, the Agency explicitly seeks documentation as to follow up training in the clause concerning an employee who violates SNAP.

The regulation also provides: "FNS shall consider a training program effective if it meets *or is otherwise equivalent to the following standards*…." 7 C.F.R. § 278.6(i)(2) (emphasis added). Significantly, that clause is followed by two distinct sentences that concern the requirement of initial training within one month of hire. The third sentence, about subsequent, periodic training, stands alone. And, the regulation uses the word "periodically" to describe retraining, but it does not define the meaning or frequency of "periodically."

In analyzing the provisions, I am mindful of the statutory revision enacted by Congress to provide, under certain circumstances, the sanction of a CMP in lieu of permanent disqualification. *See* 7 U.S.C. § 2021(b)(3)(B); *see also Kisor*, 139 S. Ct. at 2415. In amending the statute to allow for a CMP, Congress sought to "expand[ ] the types of evidence that can be used to show that a fine is more appropriate than permanent disqualification." H.R. Rep. No. 101–916, at 1098 (1990) (Conf. Rep.), reprinted in 1990 U.S.C.C.A.N. 5286, 5623. And, Congress suggested that "[e]xamples of an effective policy and program…might include the following: (i) effective written policies and procedures to be followed by store personnel that are consistently applied by management, (ii) **initial training** of store manager and employees in the proper handling of food stamps; (iii) **periodic oversight and continuing education** of store personnel in the proper handling of food stamps; and (iv) **other reasonable and good faith efforts** that demonstrate the existence of an effective policy and program by the store or concern to prevent violations of the act or regulations." H.R. Rep. No. 100–828, at 27 (emphasis added).

Thus, Congress seemed to distinguish between the requirement for initial training and periodic retraining, with some flexibility as to when and how retraining should occur.

The D.C. Circuit's reasoning in *Affum*, 566 F.3d 1150, supports this construction of § 278.6(i)(2). In that case, the district court held that the plaintiff's "'affidavit alone' was not substantial evidence of an effective anti-trafficking program…." *Id.* at 1162. "In other words, the District Court was apparently of the view that a store owner's affidavit, without 'any additional proof,' could never amount to substantial evidence of an effective anti-trafficking program." *Id.* On appeal, the D.C. Circuit found the district court's reasoning problematic because "it confuses the form of evidence necessary to show an effective compliance program with the content of that evidence." *Id.*

The *Affum* Court said: "As we have explained, '[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'…. The term means more than a scintilla, but less than a preponderance of the evidence…. In its common usage, the term 'substantial evidence' in § 2021(b)(3)(B) thus says nothing about the particular forms of evidence that a store owner may use to demonstrate her eligibility for a civil money penalty." *Id.* at 1162-63 (internal citations omitted) (alterations in *Affum*); *see Kim*, 121 F.3d at 1276. The *Affum* Court noted, 566 F.3d at 1163: "[T]he regulations implementing the statute are 'flexibl[e]' and similarly do not limit a store owner in the forms of evidence that she may submit to the agency…. A store owner such as [the plaintiff] may thus attempt to show that she qualifies for the alternative sanction via an affidavit, oral testimony, documents, or other forms of evidence as may be appropriate in a given case." Further, it stated, *id.* at 1164: "[C]ontrary to the Government's argument, [§ 278.6(i)(2)] merely requires a store owner's creation of a written

document during the agency's inquiry into a possible violation, not contemporaneously with any training."

The D.C. Circuit observed that the plaintiff had "submitted a written letter to the agency (and later an affidavit to the District Court)" explaining that "she expressly told the store clerk from the beginning that it was impermissible to exchange cash for food stamp benefits." *Id.* at 1164-65. Thus, the court concluded, *id.* at 1165: "If Affum's account is truthful, then it would appear that she maintained an effective policy and training program as required by the existing regulations. The Government has never suggested that Affum's account is false. Rather, the Government's argument rests on the ground that Affum did not maintain a written policy or contemporaneous written documentation of training activity—requirements that the regulations do not appear to impose."

In this case, plaintiffs presented evidence that Store employees were trained as to SNAP requirements, including that they are prohibited from exchanging cash for food stamp benefits. ECF 10-18, ¶¶ 3, 5, 6; *see* ECF 12-1. And, during the hearing, both Mr. Rashid and the store manager testified that they continually discuss the SNAP rules with the Store employees while the employees are at work. Thus, under the *Affum* Court's reasoning, if the testimony of Mr. Rashid and Mr. Alshameri "is truthful, then it would appear [that plaintiff] maintained an effective policy and training program as required by the existing regulations." *Affum*, 566 F.3d at 1165; *see Freedman v. United States Dep't of Agriculture*, 926 F.2d 252 (3d Cir. 1991) (affirming FNS' imposition of a civil money penalty, rather than disqualification, based on affidavits by the convenience store owner and two employees attesting to the store's training practice).

FNS never suggested that Mr. Rashid's account is false. Rather, as in *Affum*, the Agency rested its decision on the ground that Mr. Rashid did not maintain written documentation of retraining activity. But, in doing so, the Agency seemingly failed to adopt the flexible approach promulgated in its regulation and failed to consider the documentation that Mr. Rashid *did* provide. Moreover, as for retraining, the regulation does not clearly require a particular form of retraining.[11]

Two cases with strikingly similar facts to this case also provide useful guidance. *See Ahmed*, 47 F. Supp. 2d 389; *Castillo*, 989 F. Supp 413.[12]

In *Ahmed*, 47 F. Supp. 2d 389, a "small grocery store," with one to two employees in addition to the owner and manager, was permanently disqualified from participating in SNAP based on one documented trafficking violation. *Id.* at 390-91. After receiving a charge letter from FNS, the store manager submitted an affidavit averring that as the manager, "he and [the owner] personally trained employees and that he often advised employees of the food stamp regulations in both English and Arabic." *Id.* at 391. The FNS failed to "address the sufficiency of the affidavit, or to mention its existence," suggesting that it "did not consider the affidavit in determining whether plaintiff was eligible for a CMP." *Id.* at 394. In its opinion granting the plaintiff a preliminary injunction, the court noted that the "proof necessary to establish such a [training] program is onerous and unrealistic when applied to a small business with only one or two employees." *Id.* at 397. And, the court observed: "These regulations appear to run contrary to congressional intent to 'expand[ ] the types of evidence that can be used to show that a fine is

---

[11] Moreover, Employee 1, who committed the Store's SNAP violations, was hired and trained in January 2020—only six months prior to the violations. ECF 10-16 at 6. Therefore, there was little opportunity for a formal retraining of him in that short period.

[12] Curiously, plaintiffs did not draw our attention to either of these cases.

more appropriate than permanent disqualification.'" *Id.* (citing H.R. Rep. No. 101–916, at 1098). Thus, the court concluded that the store manager's affidavit, "coupled with the store's previously spotless record in the Food Stamp Program, suggests that the store did in fact have an effective training program" and it "is likely that plaintiff will show that the FNS's failure to consider this program in determining whether the store was eligible for a CMP was arbitrary or capricious." *Id.*

Similarly, in *Castillo*, 989 F. Supp 413, the store owner received a charge letter notifying him of two instances of trafficking involving his store. *Id.* at 414. The owner responded with a letter indicating that he attempted to operate his business in a legal manner and that he had recently terminated several employees. *Id.* During the administrative review process, the FNS determined that he was not eligible for a CMP because "'he did not submit the required documentation as specified in the charge letter.'" *Id.* (internal citation omitted). In reviewing the FNS's refusal to grant a CMP in lieu of permanent disqualification, the court observed that the owner had no record of previous violations, at least one store clerk had refused to allow a USDA investigator to purchase eligible items, and the two trafficking violations that were documented were committed by the same clerk and amounted to less than $200 in trafficked benefits. *Id.* at 418. The court also considered the owner's affidavit describing the store's training program. The court observed, *id.* at 414: "Although [plaintiff's] affidavit is not a model of clarity, it can fairly be read as, at least, an attempt to demonstrate that plaintiff had an effective compliance policy in place prior to the violations." Thus, the court concluded that the "ARO may have failed to consider or weigh the evidence to determine whether plaintiff satisfied the four criteria" and granted plaintiff's motion for a preliminary injunction. *Id.* at 419-420.

As in *Ahmed* and *Castillo*, the Store in this case is a small convenience store. It has one to three employees, including the manager, who work in the Store at any given time. The owner is usually present, working long hours, often seven days a week. As discussed, the Store owner submitted documentation and an affidavit establishing that he had a compliance policy regarding SNAP and that he trained new employees as to that policy after hire. In addition, employees received ongoing training, informally, while at work. As in *Ahmed* and *Castillo*, the combination of the Store owner's affidavit and the Store's otherwise "spotless record" suggest that its compliance and training program was generally effective. Requiring additional documentary proof about formal retraining of employees seems "onerous and unrealistic" and contrary to congressional intent. *See Ghattas*, 40 F.3d at 285-86 (holding that the regulations were "skewed to the disadvantage of small businesses and thus, were arbitrary and capricious").

Furthermore, although many courts have upheld sanctions involving disqualification, those cases often involve owners who failed to submit a request for CMP or failed to submit any documentation with that request. *See, e.g.*, *Green Apple Grocery*, 2021 WL 533730; *A to Z Gas & Food, Inc. v. Perdue*, CV 19-12911, 2021 WL 1600038, at *5 (E.D. Mich. Apr. 23, 2021); *Mkt. v. United States,* No. 2:19-CV-00073-SMJ, 2020 WL 4043819, at *5 (E.D. Wash. July 17, 2020); *Four Winds Behav. Health v. United States*, No. CV 19-212 SCY/LF, 2020 WL 4001998, at *4 (D.N.M. July 15, 2020); *Duchimaza v. United States*, 211 F. Supp. 3d 421 (D. Conn. 2016); *Mahmood,* 2012 WL 3038638. And, in other cases, the stores are penalized for engaging in much more extensive violations than those in this case. *See, e.g.*, *Mann v. United States*, 19-cv-01354-SKO, 2021 WL 1839709, at *1 (E.D. Cal. May 7, 2021); *Capellan v. United States*, No. 17 CIV. 9342 (AT), 2020 WL 1047907, at *6 (S.D.N.Y. Mar. 4, 2020); *Almonte Mkt. v. United States*, No. 3:18-CV-30035-KAR, 2020 WL 93994, at *10 (D. Mass. Jan. 8, 2020); *Negash*, 2018 WL

722481; *but see, e.g., 7-Eleven, Inc. v. United States*, GLR-15-543, 2016 WL 5107129 (D. Md. Jan. 29, 2016) (finding FNS did not abuse its discretion in permanently disqualifying 7-Eleven store that did not provide evidence of effective personnel training program even though the FNS only documented two SNAP violations).

The disqualification of the Store upon its first offense in 16 years of business seems to be an "unduly harsh" policy and "runs contrary to congressional intent in implementing the Hunger Prevention Act of 1988." *Ahmed*, 47 F. Supp. at 397. To be sure, "Congress has been quite firm in ensuring that food stamps . . . are not exchanged for cash or other things of value." *Idias*, 359 F.3d at 697; *see Negash*, 772 F. App'x at 36. But, in 1988, when Congress gave discretion to the Secretary to impose a civil money penalty in lieu of permanent disqualification, it noted: "The permanent disqualification of retail food stores upon the first trafficking offense—without any evaluation of preventative measures taken or complicity in the trafficking—seems excessively harsh." H.R. Rep. No. 100-828, at 27-28. And, in giving the Secretary the option to impose a CMP, it sought to ensure that the "punishment will more closely fit the crime." *Id.*

In this case, it does not appear that the punishment fits the crime. Disqualifying the Store permanently is the equivalent of hitting a fly with a sledgehammer.

Accordingly, considering the documentary evidence of the Store's initial training program upon hire and its compliance policy, coupled with the affidavit as to informal and ongoing retraining, along with the Store's lengthy spotless record and its size, leads me to conclude that plaintiffs have demonstrated a likelihood of success as to the claim that the sanction of permanent disqualification is arbitrary and capricious.

## V.     Conclusion

In light of the foregoing, the Motion is granted. FNS is enjoined from enforcing the

Store's disqualification until the Court's final disposition.

      An Order follows.


Date: July 1, 2021                          _____/s/_____
                                        Ellen L. Hollander
                                        United States District Judge